2002 OK CR 18

**Oscar PATTERSON III, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2000–291.**

Court of Criminal Appeals of Oklahoma.

April 12, 2002.

David C. Phillips III, Attorney at Law, Tulsa, OK, attorney for defendant at trial.

Steven L. Sewell, John Heil, Asst. District Attorneys, Tulsa County Courthouse, Tulsa, OK, attorneys for the state at trial.

William H. Luker, Michael D. Morehead, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General, Robert Whittaker, Asst. Attorney General, Oklahoma City, OK, attorneys for the state on appeal.

## OPINION

JOHNSON, Vice–Presiding Judge.

¶ 1 Appellant, Oscar Patterson III, was charged in Tulsa County District Court Case No. CF–98–5967 with First Degree, Malice Aforethought Murder (21 O.S.1991, § 701.7(A)). The State filed a bill of particulars, alleging two aggravating circumstances in support of the death penalty: (1) that Appellant committed the murder in order to avoid or prevent lawful arrest or prosecution, and (2) that there existed a probability Appellant would constitute a continuing threat to society. 21 O.S.1991, § 701.12(5), (7). Jury trial was held January 19 through February 8, 2000, before the Honorable J. Michael Gassett, District Judge. The jury found Appellant guilty as charged, found the existence of both aggravating circumstances, and recommended punishment of death. The trial court sentenced Appellant accordingly on February 29, 2000, and this appeal followed.[1]

---

1. Appellant perfected his appeal by filing a Petition in Error on August 11, 2000. On February 23, 2001, Appellant timely filed a motion for new trial based on newly-discovered evidence, with

¶ 2 By order issued December 5, 2001, this Court remanded the case to the District Court of Tulsa County for an evidentiary hearing on issues raised in Appellant's motions regarding newly-discovered evidence and ineffective assistance of counsel. The hearing was held January 14, 2002, before the Honorable J. Michael Gassett, District Judge. The district court's findings of fact and conclusions of law were filed in this Court February 8, 2002, and the parties submitted supplemental briefs on the issues addressed at the hearing. Oral argument before this Court was held February 26, 2002, at the University of Oklahoma Law School.

¶ 3 Appellant raises sixteen propositions of error in his brief in chief, in addition to the issues addressed at the evidentiary hearing. Having reviewed the record on appeal, as well as the additional record made at the evidentiary hearing and the district court's findings and conclusions thereon, we conclude that Appellant's conviction must be **REVERSED** and the case **REMANDED FOR A NEW TRIAL.**

¶ 4 Because we reverse, only a brief summary of the evidence is necessary. Appellant was convicted of murdering his stepdaughter, Tiffiany Beverly.[2] Appellant lived with his wife, Beatrice Patterson, and her two daughters from a prior marriage, thirteen-year-old Lakisha and fifteen-year-old Tiffiany. On May 27, 1997, the day of her disappearance, Tiffiany had received permission from her mother to go to a Tulsa mall to play video games and buy a birthday present for her sister. Beatrice Patterson was at work all day, and her two daughters were in Appellant's care. Appellant, a self-employed janitor, had a job scheduled that afternoon but agreed to take Tiffiany to the mall. That morning, Appellant had taken Lakisha to color guard practice, while Tiffiany remained

at home. Around noon, Appellant picked up Lakisha from color guard practice and took her to percussion camp. Along the way, he told Lakisha he was going to take Tiffiany to the mall later that day.

¶ 5 Appellant arrived at the site of his afternoon cleaning job just after 1:00 p.m. Shortly before 3:00 p.m., Appellant called his wife and asked her to pick up Tiffiany from the mall, explaining that he was still working at the afternoon job. After finishing his cleaning job, Appellant picked up Lakisha from percussion camp at approximately 4:00 p.m. and went home, where he received a call from Beatrice, saying she had been unable to find Tiffiany at the mall. Tiffiany was never seen again by her family.

¶ 6 Police were notified of Tiffiany's disappearance, and an extensive investigation was soon underway. The story received local media attention, and even national exposure on a missing-persons television show. Yet, police had few if any developments in the case until early 1998, when Sebastian Smith, a convicted felon and inmate at the Tulsa County Jail, told police he had information concerning Tiffiany's disappearance. Smith was one of several men, including Appellant, who bred and fought pit bull terriers, and who occasionally socialized with one another. Smith claimed that another man in this group, Paul Bryan, had told him (Smith) that Appellant had confessed to killing Tiffiany.

¶ 7 Police arranged to meet with Bryan. After initial denials and lengthy questioning, Bryan eventually claimed that sometime in the summer of 1997, Appellant had confessed to murdering Tiffiany in his truck after sexually assaulting her. According to Bryan, Appellant claimed to have killed Tiffiany by hitting her several times in the head with a tire tool. (Bryan claimed he had withheld this information for almost a year because he

brief in support. *See* Rule 2.1(A)(3), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2001). On April 23, 2001, Appellant filed his brief in chief in the appeal; he also filed a notice to the Court of additional evidence regarding certain issues raised in the brief, and an application for an evidentiary hearing, pursuant to Rule 3.11(A) & (B)(3), *Rules of the Oklahoma Court of Criminal Appeals, id.* The State filed its response brief on August 22, 2001, and an amended brief, tendered on August 23, 2001,

was accepted for filing on October 5, 2001. On September 7, 2001, Appellant filed a notice to the Court under seal, and served a copy of the notice on the State. Appellant filed his reply to the State's response brief on September 10, 2001.

**2.** According to the record, the victim's name is spelled "Tiffiany."

did not want to "narc" on anyone.) Although Bryan claimed Appellant never disclosed where he left Tiffiany's body, Bryan suggested a rural area in Wagoner County where her body might be found.

¶ 8 Ten days after Paul Bryan first talked with police, Tiffiany's remains were found in a field in the general area Bryan described. The discovery was not, however, made as a result of Bryan's information; a landowner happened to see a human skull as he mowed the property. A search of the area led to the discovery of 37 of the 206 bones comprising a human skeleton. The remains were identified as Tiffiany's through forensic anthropology, forensic odontology, and DNA analysis. Based on Bryan's account, a search warrant was obtained for Appellant's truck. After a search and testing, nothing incriminating was found.

¶ 9 Appellant was arrested for the premeditated murder of Tiffiany Beverly in November 1998. At trial, Appellant's purported confession to Paul Bryan was the only direct evidence linking Appellant to the offense. Initially, the State's theory of the case appeared to be that, consistent with the confession purportedly made to Bryan, Appellant took Tiffiany out in his truck, sexually assaulted her, and then inflicted fatal blows to her head with a tire tool. However, Bryan's credibility was called into question when he vacillated on the details of the confession. At one point, Bryan retracted parts of the confession and claimed that the police, not Appellant, had supplied some of the details to him. In an effort to impeach its own best witness, the State called the detective who first interviewed Bryan to deny that the police had ever supplied details of the purported confession to Bryan. By the conclusion of the guilt stage of the trial, the State was advancing a second theory: that Appellant had in fact raped and suffocated Tiffiany in the home, rather than beating her to death in his truck, as Bryan had claimed. This theory was made by the prosecutor during closing argument, at a time when the defense could not attack such a charge.

¶ 10 Throughout the trial, Appellant maintained his innocence of any wrongdoing. As part of his defense, Appellant presented testimony from several people who claimed to have seen a girl resembling Tiffiany at various locales after her disappearance. The jury found Appellant guilty and, finding both of the aggravators alleged by the State, recommended a sentence of death.

¶ 11 As noted above, Appellant timely filed a motion for new trial, based on newly-discovered evidence, during the pendency of this appeal. He also requested an evidentiary hearing to address claims of ineffective assistance of counsel regarding evidence available at the time of trial but not utilized. We remanded the matter to the district court for an evidentiary hearing on these claims.

¶ 12 Although Appellant presented a number of witnesses and other evidence at the hearing, we address only the evidence material to the district court's recommendation that Appellant receive a new trial. First, Appellant presented testimony suggesting that the State's prime witness against Appellant, Paul Bryan, had made statements after Appellant's trial implicating himself in Tiffiany's murder. Jobanue Kinser [3] testified that in late March 2001, she heard Bryan, during a violent domestic dispute, threaten to kill his wife "like [he] killed Tiffiany Beverly." Kinser recalled hearing Bryan make several such statements during the time she associated with him, and specifically recalled another in January 2000 (about the time of Appellant's trial) when Bryan allegedly said that Tiffiany "deserved to die" and "I don't care if another man pays for what I did."

¶ 13 Applying the four criteria for claims of newly-discovered evidence, see *Hunter v. State*, 1992 OK CR 19, ¶ 15, 829 P.2d 64, 67, the district court found that (1) Appellant's trial counsel could not have discovered Kinser's testimony prior to trial (as these statements would have been made after the trial); (2) Kinser's testimony would not have been cumulative to other testimony presented at trial; (3) Kinser's statements were material, as they were admissions of guilt by the only

---

**3.** Kinser was the girlfriend of Sebastian Smith, the man who first told police that Bryan knew     something about Tiffiany's disappearance.

prosecution witness who claimed to have heard Appellant confess to the murder; and (4) had Kinser's testimony been introduced at Appellant's trial, there was a reasonable probability it would have changed the outcome.

¶ 14 The court further found that Kinser's testimony about Bryan's purported confessions was roughly as credible as Bryan's testimony about Appellant's purported confession. Although Bryan had consumed intoxicants when he made the statements, and Kinser did not report this information to police, the district court noted that the same could be said for the circumstances surrounding Appellant's purported confession to Bryan. The district court concluded that given the circumstantial nature of the evidence against Appellant, and the importance of Bryan's testimony to the State's case, there was a reasonable probability that Kinser's testimony, bearing on Bryan's credibility, could have "created reasonable doubt [as to Appellant's guilt] in the mind of at least one juror."

¶ 15 On the issue of ineffective assistance of counsel, Appellant presented the testimony of Jonython Mason, who claimed to have seen Tiffiany alive several months after May 27, 1997. Mason was a classmate of Tiffiany's during the preceding school year and was well acquainted with her. In fact, Mason, who is deaf, testified that Tiffiany had expressed an interest in learning sign language. Mason testified that in August 1997, he took a job at a pizza restaurant in Claremore, Oklahoma. On one of his first days at the job, he observed a girl he believed to be Tiffiany in the restaurant. Mason testified that the two acknowledged each other with sign language. At the time, Mason did not know Tiffiany had been reported missing; when he learned this a few days later, he contacted the police, who interviewed him and made a report.

¶ 16 Police reports reflecting Mason's statement were included in materials provided to Appellant's trial counsel before trial. In fact, trial counsel listed Mason as a potential defense witness. However, trial counsel did not call Mason as a witness at trial. At the evidentiary hearing, counsel recalled some sort of difficulty in contacting Mason, but could not recall specifically what the difficulty was. Counsel testified that he had hired an investigator to assist on the case, but could not recall whether the investigator had ever been successful in contacting Mason. While counsel testified he felt Mason's testimony would have been helpful, he already had several witnesses who would testify to sightings of Tiffiany after May 27. Mason himself did not recall ever being contacted by anyone other than the police before Appellant's trial.

¶ 17 Analysis of any ineffective-counsel claim must begin with the deferential presumption that trial counsel's performance falls within the "wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *Miller v. State*, 2001 OK CR 17, ¶ 41, 29 P.3d 1077, 1085. In analyzing Mason's testimony, the district court properly applied the four criteria for adjudging ineffective-counsel claims. *See* Rule 3.11(B)(3)(b)(iii), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2001). First, the district court concluded that Mason was available to testify at Appellant's trial. Second, the court concluded that Mason's testimony would have been "far more persuasive" than that of other witnesses who did testify at trial about seeing Tiffiany after her disappearance, because only Mason was personally acquainted with Tiffiany; the other witnesses only reported possible sightings based on photographs of Tiffiany which had been disseminated in the media.

¶ 18 Third, the court concluded that trial counsel's failure to secure Mason's attendance could not be deemed a sound strategic decision; counsel's recollection as to why he had not contacted Mason was sketchy, and Mason testified that he was never contacted by anyone from Appellant's trial defense team. *See Smith v. State*, 1982 OK CR 143, ¶ 21, 650 P.2d 904, 908 (trial counsel's failure to exercise ordinary diligence to pursue information which he knows to be relevant to the client's case cannot be deemed a mere "strategic error"). Finally, the district judge who presided at Appellant's trial was familiar

with the tenor of the evidence presented and concluded that "had the jury heard about Mr. Mason's testimony, it is reasonably probable that at least one juror would have believed that Mr. Mason saw Ms. Beverly in August of 1997." If any juror did in fact believe Mr. Mason's story, this would end the theory of the State, as the victim would have been alive after the time the State claims the murder took place.

¶ 19 Although this Court must make the ultimate determination of whether newly-discovered evidence warrants a new trial, we afford great deference to the district court's findings on the issue, and review only for an abuse of discretion. *Hunter*, 1992 OK CR 19 at ¶ 19, 829 P.2d at 67. The same is true for claims of ineffective assistance of counsel regarding evidence which was available at the time of trial. Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2001). The district court has the benefit of receiving live testimony on the issues presented and judging the credibility of the witnesses first-hand. We find the district court's findings and conclusions are supported by the record. *Wilhoit v. State*, 1991 OK CR 50, ¶¶ 4–5, 816 P.2d 545, 546–47.

¶ 20 We commend the district court judge for his thorough analysis of the evidence presented at the hearing and his faithful application of relevant principles of law. When material evidence is not presented at trial, the justice in the finding of guilt is of overriding concern:

> This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable valid-

ity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Hunter*, 1992 OK CR 19 at ¶ 16, 829 P.2d at 67 (*quoting United States v. Agurs*, 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)). The judge who conducted the evidentiary hearing was the same judge who presided at Appellant's trial, and was thus in the best position to assess how the evidence presented might have affected the outcome of that trial.[4]

¶ 21 Several other issues raised by Appellant deserve brief mention.[5] All of them relate, in some way, to Paul Bryan's claim that Appellant confessed the murder to him. First, in Proposition 4, Appellant alleges error in the trial court's failure to instruct the jury that Appellant could not be found guilty unless his alleged confession to Paul Bryan was sufficiently corroborated. *See* OUJI–CR (2nd) 9–13. Although Appellant did not request this instruction, we emphasize its importance in explaining to the jury how it must assess the evidence when an extrajudicial confession has been admitted. *See Fontenot v. State*, 1994 OK CR 42, ¶ 32, n. 15, 881 P.2d 69, 80, n. 15.

¶ 22 Such an instruction was of critical importance in this case, given that (1) the purported confession was the only direct evidence linking Appellant to the offense, (2) the only evidence of the oral confession was Bryan's testimony, and (3) Bryan was inconsistent on several of the confession's basic components. Bryan's wavering about how, where, and why the murder allegedly took place bore directly on the jury's determination of guilt, as well as the sufficiency of the evidence to support one of the two aggravating circumstances supporting the death penalty, *i.e.* that the murder was committed to avoid lawful arrest or prosecution.[6] In the

---

4. The district court's expeditious and diligent resolution of these matters on remand has been of great assistance to this Court. Our special thanks is extended to Judge Gassett.

5. Although Appellant raises a number of issues in his brief, we find it unnecessary to comment on each of them at this time.

6. To support this aggravating circumstance, the State had to prove (1) that Appellant sexually

assaulted Tiffiany, (2) that the assault was an offense distinct from the homicide, and (3) that Appellant's intent in committing the homicide was to avoid arrest or prosecution for the assault. *See* OUJI–CR (2nd) No. 4–75 (2000 Supp.). Bryan could not say how much time elapsed between the rape and the murder. In fact, Bryan was not even sure if Appellant had actually raped Tiffiany or only attempted to rape her. Furthermore, Bryan's credibility as to

event of a retrial, we admonish trial counsel to apprise the court of the importance of the corroboration instruction. The record reflects that trial counsel did not request this instruction, and this failure forms the basis of one of Appellant's ineffective-counsel claims.

¶ 23 In Proposition 5, Appellant claims he was denied a fair trial when the prosecutor changed the State's theory of the case in closing argument. An accused is entitled to notice of the charge he must be prepared to defend against. *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948). A variance between the charge made in the Information, and the evidence or theory presented at trial, is not fatal to the conviction unless it either deprived the defendant of adequate notice of what he had to defend against, or subjects him to double jeopardy. *United States v. Randall,* 171 F.3d 195, 203 (4th Cir.1999). We consider all information made available to the defense before trial to determine whether Appellant was unfairly surprised by the prosecutor's suggestion that Tiffany was murdered in the home. *Parker v. State,* 1996 OK CR 19, ¶ 24, 917 P.2d 980, 986, *cert. denied,* 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997).

¶ 24 Consistent with Paul Bryan's statements, the Information alleged that Appellant killed Tiffany by hitting her in the head with a tire tool. Bryan initially claimed that Appellant admitted to striking the fatal blows while he and Tiffany were parked in a rural area in his truck. At trial, however, Bryan claimed the police, not Appellant, had supplied the information about the homicide taking place in the truck. The State impeached Bryan on this point by calling the police detective who first interviewed Bryan. Apparently in response to Bryan's waning credibility, as well as the forensic anthropologist's inability to conclusively say how and when the hole in Tiffany's skull might have been inflicted, the prosecutor repeatedly sug-

gested in closing argument that Appellant had raped Tiffany and suffocated her in the family home before dumping her body in rural Wagoner County.

¶ 25 A variance between the charge and the theory presented at trial is not fatal unless it denies the defendant some substantial right. *United States v. McClatchey,* 217 F.3d 823, 831 (10th Cir.2000), *cert. denied,* 531 U.S. 1015, 121 S.Ct. 574, 148 L.Ed.2d 492. In this case, Appellant's substantial rights were violated for two reasons. First, there was no evidence that Tiffany died from suffocation; indeed, there was no evidence that Tiffany died in the home. Second, this new theory, whether or not supported by any evidence, was diametrically opposed to the only direct evidence in the case: the purported confession to Paul Bryan. As noted above, the jury was never instructed that Bryan's testimony about Appellant's confession had to be corroborated in some material respect. The prosecutor thus invited the jury to (1) consider the fact that Appellant confessed, but (2) pay no attention to any details of that purported confession or any credibility problems with the person relating it, and (3) convict Appellant on a theory that had no evidentiary basis. We conclude that Appellant's substantial rights were violated when the jury was invited, in closing argument, to convict Appellant on a theory that necessarily required them to reject the essence of the purported confession. 20 O.S. 1991, § 3001.1.

¶ 26 Finally, we address Proposition 7 of Appellant's brief, wherein he challenges Tulsa County as the proper venue for the prosecution. Throughout the proceedings below, Appellant alleged that Wagoner County was the appropriate venue, based on Paul Bryan's testimony about the purported confession.

¶ 27 The right to be tried by a jury from the county where the crime was committed is guaranteed by our state consti-

---

whether the murder was, in fact, committed to avoid arrest or prosecution is itself suspect. At trial, Bryan claimed that Appellant admitted killing Tiffany for fear that she would tell relatives or the police about the assault. Yet, in his initial statement to the police, Bryan retracted this claim as yet another assumption on his part:

*"I'm assuming that part, yeah. He didn't tell me, you know, I had to kill her because she was going to tell."* See also *Littlejohn v. State,* 1998 OK CR 75 at ¶ 37, 989 P.2d 901, 911 (defendant's alleged confession of other crimes to his cellmate, used to support continuing-threat aggravator, lacked sufficient corroboration).

tution. Okla. Const. art. 2, § 20. Where uncertainty exists as to which of several counties was the situs of the offense, the accused may be tried in any county in which the evidence indicates the crime might have been committed. *Id.* Venue is a preliminary matter for the court to decide as a matter of law. *State v. Love,* 1998 OK CR 32, ¶ 3, 960 P.2d 368, 369. Venue may be established by circumstantial evidence, and need only be established by a preponderance of evidence. *Rawlings v. State,* 1987 OK CR 135, ¶ 38, 740 P.2d 153, 159.

¶ 28 Bryan claimed that Appellant confessed to taking Tiffiany out to an isolated rural area where he exercised his bulldogs. Bryan knew the general area, because he had first suggested the area to Appellant as a good place to exercise dogs. Bryan's description strongly suggested that the situs of the offense appeared to be in Wagoner County. Further, Appellant leased a parcel of land in Wagoner County where he kept some of his

dogs. Tiffiany's remains were found in rural Wagoner County.[7] In the event that venue is again challenged, we encourage the district court to carefully consider the issue in light of Bryan's testimony or what other evidence may come to light.

## DECISION

¶ 29 The Judgment and Sentence of the district court is **REVERSED AND REMANDED FOR A NEW TRIAL.**

LUMPKIN, P.J., CHAPEL and STRUBHAR, JJ, concur.

LILE, J., concurs in result.

---

**7.** The State has never alleged that Appellant forcibly took Tiffiany from their Tulsa County home and murdered her elsewhere, which, if factually supported, might render Tulsa County an appropriate venue. *See Richie v. State,* 1995 OK CR 67, ¶ 14, 908 P.2d 268, 274, *cert. denied,* 519 U.S. 837, 117 S.Ct. 111, 136 L.Ed.2d 64 (1996).