2005 OK CR 24

**Maximo Lee SALAZAR, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. PCD–2002–984.**

Court of Criminal Appeals of Oklahoma.

Dec. 7, 2005.

Bryan Lester Dupler, Laura M. Alredge, Vicki Ruth Adams, O.I.D.S., Capital Post Conviction Division, Norman, OK, Attorneys for Petitioner.

Brant M. Elmore, Asst. Attorney General, W.A. Drew Edmondson, Attorney General, Oklahoma City, OK, Attorneys for Respondent.

### OPINION GRANTING POST-CONVICTION RELIEF

### AFTER REMAND FOR JURY DETERMINATION ON ISSUE OF MENTAL RETARDATION

Opinion by C. JOHNSON, J.

¶1 Petitioner, Maximo Lee Salazar, was convicted by a jury in Comanche County District Court, Case No. CRF 1987–460, of First Degree Malice Aforethought Murder, in violation of 21 O.S.Supp.1982, § 701.7 (Count 1) and Burglary in the First Degree, in violation of 21 O.S.1981, § 1431 (Count 2). The jury found three (3) aggravating circumstances existed [1] and set punishment at death for the murder and ten (10) years imprisonment for the burglary. The trial court sentenced Petitioner accordingly. On direct appeal, we affirmed Petitioner's convictions for murder and burglary, but vacated the death sentence and remanded the case for resentencing. *Salazar v. State*, 1993 OK CR 21, 852 P.2d 729. A new sentencing proceeding was held before the Honorable Allen McCall, District Judge, on November 14–17, 1994, and the jury again returned a sentence of death. The jury found one (1) aggravating circumstance existed.[2] Petitioner appealed, and this Court again reversed and remanded the case for a second resentencing hearing. *Salazar v. State*, 1996 OK CR 25, 919 P.2d 1120.

¶2 A third sentencing hearing was conducted before the Honorable Allen McCall, District Judge, on October 28–31, 1996. The jury again returned a sentence of death, finding the existence of two (2) aggravating circumstances—that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution, and that Petitioner posed a continuing threat to society. On appeal, we affirmed Petitioner's death sentence. *Salazar v. State*, 1998 OK CR 70, 973 P.2d 315. Petitioner's Original Application for Post–Conviction Relief and Verified Motion for Evidentiary Hearing on Post–Conviction Claims were denied. *See* Order Denying Application for Post–Conviction Relief and Verified Motion for Evidentiary Hearing, *Salazar v. State*, PC 1998–663 (Okl. Cr. August 20, 1999)(not for publication). The United States Supreme Court denied

---

1. [1] the defendant knowingly created a great risk of death to more than one person; [2] the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and [3] the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1981, § 701.12(2), (5) and (7) respectively.

2. The defendant knowingly created a great risk of death to more than one person. 21 O.S.1981, § 701.12(2).

certiorari in *Salazar v. Oklahoma,* 528 U.S. 895, 120 S.Ct. 226, 145 L.Ed.2d 190 (1999).

¶ 3 On November 4, 2002, Petitioner filed a Successor Application for Post–Conviction Relief, pursuant to 22 O.S.2001, § 1089, and a Motion for Evidentiary Hearing, filed pursuant to Rule 9.7(D), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2002). We remanded the matter to Comanche County for an evidentiary hearing on Petitioner's claim of mental retardation, as raised in Proposition One of his Successor Application for Post–Conviction Relief. *See* Order Granting Motion for Evidentiary Hearing on Proposition One of Successor Application for Post–Conviction Relief, *Salazar v. State,* PCD 2002–984 (Okl.Cr. December 12, 2002)(not for publication). After the evidentiary hearing, we granted post-conviction relief, in part, and remanded this case to Comanche County District Court for a jury determination on Petitioner's claim of mental retardation. *See* Order Denying Post–Conviction Relief on Proposition Two; Order Granting Post–Conviction Relief on Proposition One and Remanding to the District Court of Comanche County for a Jury Determination on the Issue of Mental Retardation, *Salazar v. State,* PCD 2002–984 (Okl.Cr. June 11, 2003)(not for publication).

¶ 4 Pursuant to this Court's June 11th, 2003 Order, the Honorable Allen McCall, District Judge of Comanche County, empanelled a jury and trial on Petitioner's claim of mental retardation was held September 2nd, 2003 through September 5th, 2003. At the conclusion of the hearing, the jury found Petitioner was not mentally retarded. Petitioner, through counsel, then filed a Motion for New Trial, Judgment Notwithstanding the Verdict and Post–Trial Review in the District Court. The District Court denied these motions after a hearing on October 7, 2003. The trial court filed its Findings of

Fact and Conclusions of Law in this Court on November 3, 2003.

¶ 5 Counsel for Petitioner filed a new Petition in Error and sought clarification of the procedure to appeal from the jury's verdict and from the trial court's Findings of Fact and Conclusions of Law. On January 15, 2004, counsel for Petitioner filed the Brief of Petitioner with Combined Motion for New Trial Based on Newly Discovered Evidence. A Motion to Supplement the Record, with attached supporting affidavits, was also tendered for filing on that date. In response to the request for clarification and in consideration of other pending cases involving post-conviction mental retardation claims, we published uniform procedures to be followed in capital post-conviction mental retardation cases. *Salazar v. State,* 2004 OK CR 4, 84 P.3d 764. In that Order, we advised Petitioner to file a new brief in compliance with the procedures and rules set forth therein and also denied Petitioner's Motion for New Trial on Newly Discovered Evidence.[3] *Salazar,* 2004 OK CR 4, ¶¶ 3, 9, f. 2, 4, 84 P.3d 764, f. 2, 4. Thereafter, Petitioner's Brief was filed on February 18, 2004. Respondent's Supplemental Brief Following Jury Determination was filed on February 18, 2004.

¶ 6 Petitioner raises six propositions of error arising from the jury's determination that he is not mentally retarded:

1. The district court erred in the admission of "other crimes" evidence having little or no relevance to the limited question of mental retardation;

2. Deliberate, non-responsive comment on Mr. Salazar's right to remain silent by the State's expert witness violated the privilege against self-incrimination;

3. The trial court's instruction that mental retardation must be "present and known" before age 18 violated *Atkins v. Virginia;*

---

**3.** On January 15, 2004, Petitioner filed his "Brief of Petitioner with Combined Motion for New Trial Based on Newly Discovered Evidence." Petitioner raised issues pertaining to the jury hearing/determination of mental retardation, including an allegation of newly discovered evidence requiring remand for a new trial or an evidentiary hearing. Because the combined Brief/Motion for New Trial was not in compliance with the rules and procedures set forth in the *Salazar* clarification order, we notified Petitioner we would not consider those pleadings and directed Petitioner to file a Brief in accordance with the procedures set forth therein. *Salazar,* 2004 OK CR 4, f. 4, 84 P.3d 764, f. 4.

4. The trial court erred by denying Mr. Salazar's request to submit non-unanimous verdict forms to the jury;

5. The jury's verdict found Mr. Salazar "not mentally retarded" contrary to the clear weight of the evidence properly admitted at trial; and,

6. Newly discovered evidence about the prosecution expert's use of a non-standardized "malingering test," and his misleading testimony about his own testing and that of a defense expert, requires remand for a new trial or modification.

¶ 7 In *Lambert v. State*, 2003 OK CR 11, 71 P.3d 30, we said an

[A]tkins claim of mental retardation must be resolved pursuant to the definition of mental retardation as set forth in *Murphy v. State*. For capital purposes, a mentally retarded person is one with significantly limited ability to intellectually and adaptively function in enumerated areas, who has at least one IQ test score of 70 or below, and in whom the retardation manifested itself below age 18. . . .

(footnotes omitted) *Id.*, 2003 OK CR 11, ¶ 2, 71 P.3d at 31. The decision to be made on remand "is solely devoted to the question" of mental retardation. *Id.*, 2003 OK CR 11, ¶ 3, 71 P.3d at 31. Petitioner's "criminal conviction and death sentence are not relevant to this issue" and

[t]he jury should not hear evidence of the crimes for which [Lambert] was convicted,

unless the particular facts of the case are relevant to the issue of mental retardation. Any such evidence should be narrowly confined to that issue. . . . The only issue is whether [Lambert] meets the *Murphy* definition for mental retardation.

*Id.*

¶ 8 In Proposition Five, Petitioner claims the jury's verdict that he is not mentally retarded is contrary to the clear weight of the admissible evidence. We consider this claim with the claim raised in Proposition Six—that newly discovered evidence about the prosecution expert's use of a non-standardized "malingering test," and his misleading testimony about his own testing and that of a defense expert, requires remand for a new trial or modification.

¶ 9 At the jury determination hearing, Petitioner presented testimony from two of Petitioner's school teachers who recognized his mental retardation before the age of eighteen.[4] He presented evidence of intelligence testing reflecting at least one score below seventy (70).[5] He presented testimony showing significant deficits in certain areas of adaptive functioning.[6] The State presented evidence to refute these claims and much of the State's case consisted of testimony concerning the circumstances surrounding crimes committed by Petitioner, although not the crime for which Petitioner was sentenced to death.[7]

---

4. Patt Nazari, a special education teacher in Ardmore, Oklahoma, taught Petitioner in the Ardmore Development Center. She testified he scored between fifty (50) and seventy (70) on an IQ test to be placed in the learning disabled center. Nazari testified she considered Petitioner mentally retarded. Allene Gilliam, also an Ardmore teacher of learning disabled students, testified Petitioner had "significant subaverage intellectual functioning" and said she considered him to be mentally retarded.

5. Patt Nazari testified he scored between fifty (50) and seventy (70). Dr. Samual Sherman testified Petitioner scored a sixty-five (65) on the verbal portion of the Wechsler Adult Intelligence Test and was in the mildly mentally retarded range. Dr. Sherman testified his Global Assessment Score was thirty-eight (38) which is "a fairly serious low level of functioning." Dr. Randall Price noted prior intelligence tests per-

formed by Drs. Close and Kaufman—both which reflected scores between sixty-seven (67) and eighty-three (83). The last IQ test was given to Petitioner in April 2003 by Dr. John Call and Petitioner scored a sixty-eight (68).

6. Dr. Price testified Petitioner performed poorly on the Independent Living Scale, test of adaptive abilities. Petitioner had significant deficits and scored below average. Dr. Price also reviewed personal histories reflecting Petitioner had poor personal hygiene which suggested an adaptive functioning deficit in the area of personal care and hygiene and independent life skills.

7. The State presented eleven witnesses who testified about Petitioner's commission of crimes, about his behavior during the investigation of his crimes, and about his behavior while incarcerated.

¶ 10 The State also presented two expert witnesses to dispute Petitioner's intelligence testing scores and evidence. One of these witnesses was Dr. John Call, and the record shows Dr. Call was the State's most persuasive and most pivotal witness. Dr. Call disagreed with Petitioner's forensic psychological witnesses who testified that Petitioner was mentally retarded and Dr. Call testified that each of the IQ tests reflecting a score lower than seventy was invalid for one reason or another. His testimony was crucial to the State's position, as it was he who discredited and contradicted each of Petitioner's witnesses.

¶ 11 Among other things, Dr. Call testified that Petitioner was malingering. He believed Petitioner was malingering when he, Dr. Call, administered the Wechsler Adult Intelligence Scale, 3rd Edition, and obtained a full scale IQ score of 68. Dr. Call administered the Test of Memory Malingering (TOMM) and a Forced Choice Symptom Validity Test. He described one of the two "malingering" tests he administered as one in which he showed Petitioner twenty-five common words and asked him to memorize those words. Then he gave Petitioner another list of twenty-five word pairs and asked Petitioner to identify the words he had been asked to memorize. Dr. Call testified:

> If you had never seen the words, by chance, you would get fifty percent—approximately fifty percent correct by just guessing ... The odds, the statistical odds that you would get no words correct are astronomical, so astronomical as to be unlikely, highly improbable occurrence.

> On that particular technique, Mr. Salazar obtained six words out of twenty-five correct, which is a probability of point zero zero two, two chances out of a hundred. *In science we would say that's a statistically significant event and that suggests malingering.*

(emphasis added). Dr. Call went on to talk about the "norms" for psychological testing and testified the malingering tests he administered to Petitioner showed he was "trying to look mentally retarded when he is not."

¶ 12 Dr. Call testified that all the standardized test results obtained by the psychologists who testified for Petitioner were invalid or unreliable. With regard to one of Petitioner's experts, Dr. Call suggested it was "unethical to administer tests" that have norms Petitioner did not fall within. Dr. Call also refuted Dr. Randall Price's testing, in part, by claiming that Dr. Price utilized "a non-standardized malingering test" and that he (Dr. Call) would *not* have administered a non-standardized test. Dr. Call stated "[I]t's not a norm—it's not a norm with a board certified forensic psychologist" to administer such a test. He also said it was unethical not to report the results of the test. Dr. Call testified he had never done that and believed that made the rest of Dr. Price's work suspect.

¶ 13 The above only partially illustrates the extent to which the State relied upon Dr. Call's expert testimony as its primary witness to refute and rebut Petitioner's evidence of mental retardation. Review of Respondent's Supplemental Brief shows Respondent relies upon Dr. Call's testimony almost exclusively to refute Petitioner's claim that the jury's verdict was contrary to the clear weight of the evidence presented at trial. It is obvious from review of Respondent's brief alone that Dr. Call's testimony was vitally important to the State's case, and it is partly for that reason that the allegations raised in Proposition Six and in the Affidavits supporting the Motion to Supplement the Record caused this Court concern.

¶ 14 In Proposition Six and in the Motion to Supplement the Record and Affidavits filed in support thereof, Petitioner claims that newly discovered evidence relating to Dr. Call's expert witness testimony requires remand for a new jury determination or modification of sentence. Petitioner claims Dr. Call relied upon a non-standardized scientific test which he created, and its results, to bolster his testimony refuting Petitioner's experts' findings that Petitioner was/is mentally retarded. Counsel for Petitioner argues this is the type of "non standardized testing" which Dr. Call pointedly attacked Petitioner's key expert witness for utilizing and for which he questioned that expert's ethics and findings.

¶ 15 Counsel for Petitioner admits that Dr. Call's testing procedure, specifically his administration of a Forced Choice Symptom Validity Test, was not specifically challenged by counsel in Petitioner's mental retardation trial. Counsel for Petitioner states at f. 2 of Petitioner's Brief that "[a]t the time of cross-examination, counsel believed that the other 'Forced Choice Symptom Validity Test' mentioned in Call's report was another published, standardized measure of alleged malingering. Counsel therefore avoided questioning which could give Dr. Call a further chance to expand on his opinion about malingering based on its results." Counsel for Petitioner also notes "Dr. Call's forensic credentials and his membership in the Oklahoma Bar entitled him to an initial presumption that his testimony about basic forensic facts would be accurate and above board."

¶ 16 The Affidavits attached to the Motion to Supplement reflect that this evidence was not discovered by Petitioner's counsel until after the jury trial on mental retardation. However, counsel for Petitioner admits that to the extent this evidence was discoverable prior to Petitioner's mental retardation trial, Petitioner's counsel was ineffective for failing to discover and utilize it.

¶ 17 In consideration of the claim of newly discovered evidence and Petitioner's claim that his counsel was ineffective for failing to discover the evidence, we remanded this matter to the District Court for an evidentiary hearing. *See* Order Remanding to the District Court of Comanche County for an Evidentiary Hearing, *Salazar v. State*, PCD 2002–984 (Okl.Cr. June 4, 2004)(not for publication). By that Order, we noted this Court's concern "with the availability of the evidence prior to Petitioner's mental retardation hearing, the effect the evidence would have had on the State's expert's testimony and the mental retardation determination, whether the failure to discover and utilize this evidence was trial strategy, and whether the evidence would have impacted the verdict rendered."

¶ 18 An evidentiary hearing was conducted on June 29, 2004, before the Honorable Allen McCall, District Judge. Two witnesses testified—the attorney who represented Petitioner at the jury trial on mental retardation and Dr. John Call, the State's expert witness. Certain exhibits were admitted into evidence at the hearing, which included the Affidavits attached to the Motion to Supplement the Record, three juror questionnaires, Dr. Call's report and the Raw Data of Dr. Call. The trial court considered the testimony of the two witnesses, the exhibits of the parties, the transcript of Petitioner's mental retardation trial, and its review of the file.

¶ 19 Judge McCall filed Findings of Fact and Conclusion of Law in this Court on July 23, 2004. The transcript of the evidentiary hearing was filed in this Court on September 13, 2004. This Court will give the trial court's findings strong deference if supported by the record, but we shall determine the ultimate issue of whether trial counsel was ineffective or whether newly-discovered evidence warrants a new trial. *See e.g. Patterson v. State*, 2002 OK CR 18, ¶ 19, 45 P.3d 925, 930; *Glossip v. State*, 2001 OK CR 21, ¶ 20, 29 P.3d 597, 602; Rule 3.11(B)(3)(b)(iv), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2004).

¶ 20 With regard to whether evidence of Dr. Call's use of a non-standardized test (which he created and named after his secretary to support his opinion that Petitioner was malingering and faking mental retardation) was available prior to Petitioner's mental retardation hearing, the trial court found:

> ... while there appears to be some confusion over the naming of the test in question, the actual test and results were in possession of the defense well prior to Petitioner's mental retardation trial. This does not appear to be a situation of "newly discovered evidence."

We agree with this finding. Evidence of Dr. Call's use of the "Blackwell Memory Test" was available to counsel prior to the mental retardation jury trial; the raw data for the test was turned over by the State in discovery.[8]

---

8. Petitioner's counsel from the mental retardation jury trial admitted the State turned over Dr.

Call's raw data in discovery and this data contained Dr. Call's "Blackwell Memory Test." Peti-

¶ 21 The trial court's second finding related to the effect this evidence would have had on the State's expert's testimony and the mental retardation determination. The trial court found:

Dr. Call's testimony during the evidentiary hearing indicates that the test which was thought to be newly discovered evidence was in fact a malingering test which he had named after his secretary in an attempt to disguise from the test taker the nature of the test. While his delivery of this explanation was smug, his reason for using an "administrative pseudonym" for his version of the Forced Choice Symptom Validity Test (FCSVT) is acceptable and would have had little or no effect on his overall testimony (direct or cross).

Given the totality of the evidence submitted to the jury during Petitioner's mental retardation trial, it is extremely unlikely that the confusion of this "administrative pseudonym" would have had any effect on the jury's mental retardation determination. As indicated previously, this was an outstanding jury, very attentive and fair minded to all witnesses and counsel. The evidentiary presentations by the State and Petitioner were excellent and it appeared to the Court that the instructions were understood and followed by the jury in arriving at the verdict. There exists in the record no reason to believe the mental retardation determination by the jury would have been different based on this "newly discovered evidence."

While we agree with a portion of this finding, we cannot agree with the trial court's conclusion that the discovery of this evidence relating to Dr. Call's use of a non-standardized test, which he administered to Petitioner and named after his secretary, would have had little or no effect on his testimony. Review of the entire record, including the mental retardation trial and certain exhibits admitted at the evidentiary hearing, shows this evidence would have greatly affected Dr. Call's credibility as a witness and the statements he made which discredited Dr. Price and all of Petitioner's expert witnesses.

¶ 22 At the jury trial, Dr. Call prefaced his expert testimony by telling the jury he was a licensed attorney and he was board certified by the American Board of Professional Psychology and the American Board of Forensic Psychology. He stated "I'm the only one in Oklahoma and there's about two hundred in the world that are board certified forensic psychologists." Unlike the other expert witnesses who had testified in Petitioner's trial, Dr. Call held himself out as a "unique" expert suited to testify in this area. He stated there was not sufficient data to support Petitioner's claim of mental retardation.

¶ 23 Dr. Call admitted he administered the Wechsler Adult Intelligence Scale Third Edition and the Wide Range Achievement Test Third Edition and administered two malingering tests to determine if Petitioner was putting forth his best efforts. On those tests administered by Dr. Call, Petitioner obtained a full scale IQ score of sixty-eight (68). However, Dr. Call stated the malingering tests he administered showed Petitioner was not motivated "to perform at his capacity when I administered the test." Dr. Call went on to describe the two malingering tests he administered—one of those tests we now know was the Blackwell Memory Test. On this test, Dr. Call said Petitioner's extremely low score suggested he was malingering. Dr. Call then testified that virtually every intelligence test administered to Petitioner by other mental health professionals and the scores obtained from them were invalid for various reasons.

tioner's counsel admitted he "could be charged with knowledge of the Blackwell Memory Test along in that time period," but stated he did not know what it was and did not know it was a malingering test. Further, Petitioner admits in a in his Brief that "[a]t the time of cross-examination, counsel believed that the other 'Forced Choice Symptom Validity Test' mentioned in Call's report was another published, standardized measure of alleged malingering. Counsel

therefore avoided questioning which could give Dr. Call a further chance to expand on his opinion about malingering based on its results." At the evidentiary hearing, counsel explained that he prepared to cross-examine the witness on the widely recognized Test of Memory Malingering (TOMM) but was only generally familiar with forced choice symptom validity tests because there were so many.

¶ 24 At the mental retardation jury trial, Dr. Call discredited Dr. Cowardin's test results from the Kaufman Test of Education Achievement and from the Detroit Test of Learning Aptitude, stating these tests were "not appropriate" for a person Petitioner's age; Dr. Cowardin reported Petitioner achieved a sixty-nine (69) on the Kaufman Test, in the bottom two percent of the population, and that he scored in the range of a six (6) to eleven (11) year old on the Detroit Test. He concluded his testimony about Dr. Cowardin's results by testifying her methods were unethical.

¶ 25 At the mental retardation jury trial, Dr. Call discredited the test results reported by Dr. Sherman. Dr. Sherman's previous sworn testimony was read into the trial record. Dr. Sherman worked at Eastern State Hospital during the time Petitioner was sent there to attain competency to stand trial. Dr. Sherman administered the verbal portion of the Wechsler Adult Intelligence Test to Petitioner while he was at Eastern State Hospital, and Petitioner scored a sixty-five (65). Petitioner's Global Assessment Score was thirty-eight (38), which was a "fairly serious low level of functioning." Dr. Call discredited Dr. Sherman's test results as "invalid," because Dr. Sherman only administered half of the test; he did not administer the performance portion.

¶ 26 At the jury trial, Dr. Call also invalidated Dr. Randall Price's testing of Petitioner and his results. The following transpired at trial:

Mr. Schulte: Doctor, I'd like to go to Dr. Price. I believe you received his raw data . . .

. . .

What were your findings there, sir?
Dr. Call: Well, he was performing a neuropsychological screening and as part of the screening, he did administer a—it's a simple non-standardized malingering test.
Mr. Schulte: Why would a person do a non-standardized test, sir, on a case this important?
Dr. Call: *I don't know.*

Mr. Schulte: Is that the norm within the profession?
Dr. Call: *It's not a norm—it's not a norm with a board certified forensic psychologist.*
Mr. Schulte: Such as yourself?
Dr. Call: *Correct.*

Dr. Call criticized Dr. Price's use of this test and his failure to report the results as showing Petitioner was malingering. He testified that it would be unethical to perform a malingering test and not report the results; he testified it would make the rest of the person's work "suspect" to him. Dr. Call very effectively testified for the State that Dr. Price's findings and his opinion that Petitioner was mentally retarded should not be considered because his testing was suspect and Dr. Call's tests showed Petitioner was malingering.

¶ 27 What the above colloquy shows is that Dr. Call effectively discredited Petitioner's experts by claiming they used improper testing procedures, by using tests not "normed" for a person like Petitioner, and by not properly reporting the results. Had Dr. Call not done the exact same things, there would be no problem.

¶ 28 The trial court, in its findings, stated Dr. Call's use of an "administrative pseudonym" for the Forced Choice Symptom Validity Test he administered to Petitioner was reasonable and its discovery would have had little or no effect on his testimony. We disagree. The evidence obtained after trial shows Dr. Call had himself made up and administered a non-standardized test to Petitioner and it was not administered pursuant to accepted scientific norms. Dr. Call's letter to the Assistant District Attorney, Petitioner's Exhibit 2, attempts to convince the reader that his test was accepted and reliable. However, Dr. Call's admissions at the evidentiary hearing show Dr. Call knew he relied on a non-standardized test, similar to those he had discredited at the jury trial, to convince the jury Petitioner was malingering. Further, the Affidavit of Dr. Rogers, Petitioner's Exhibit 3, shows it was, in fact, not administered according to accepted scientific norms. Had Petitioner's counsel realized the origins and basis of Dr. Call's "Blackwell

Memory Test," he could have discredited Dr. Call's testing methods in the same way Dr. Call discredited Petitioner's experts.

¶ 29 In this second finding, the trial court also stated, in part "[I]t is extremely unlikely that the confusion of this 'administrative pseudonym' would have had any effect on the jury's mental retardation determination. . . . There exists in the record no reason to believe the mental retardation determination by the jury would have been different based on this 'newly discovered evidence.' " This finding is contradicted by the record.

¶ 30 The trial court admitted certain exhibits at the evidentiary hearing. After the mental retardation jury trial, Petitioner's counsel sent juror surveys to all twelve jurors; only three were returned. Petitioner's Exhibits 4A, 4B, and 4C are the three juror surveys which were returned and these three surveys were admitted at the evidentiary hearing. Although counsel for the State indicated the State had also obtained jury responses, the State did not offer those at the evidentiary hearing.

¶ 31 Review of Petitioner's Exhibits 4A, 4B and 4C shows three important things: all three jurors surveyed rated Dr. Call as the State's most favorable or "highly credible" witness; all three jurors surveyed rated "prosecution expert (Dr. Call)" as the most important testimony; and one of those jurors made the following statement: "The incomplete testing gave greater credibility to Dr. Call's testimony and complete testing." *See* Petitioner's Exhibits 4A, 4B and 4C. These responses constitute evidence in the record which suggest the outcome of the jury trial on mental retardation might have been different had Dr. Call's credibility and testing been impeached with evidence of his use of a non-standardized, improperly administered, forced choice symptom validity test which he named the "Blackwell Memory Test."

¶ 32 We asked the trial court to determine whether trial counsel's failure to utilize this evidence could be considered a sound trial strategy and the trial court found "Petitioner's counsels' confusion over the 'administrative pseudonym' cannot be described as either a 'failure to discover' or 'trial strategy' and concluded 'any notion of ineffective assistance of counsel is unfounded.' " Again, this Court will give strong deference to the trial court's findings if supported by the record, but we shall determine the ultimate issue of whether trial counsel was ineffective. Rule 3.11(B)(3)(b)(iv), *Rules of the Court of Criminal Appeals,* Title 22, Ch.18, App. (2004); *see also Glossip,* 2001 OK CR 21, ¶ 20, 29 P.3d 597, 602.

¶ 33 At the evidentiary hearing, trial counsel admitted he knew Dr. Call administered two malingering tests from which he concluded Petitioner was not mentally retarded as the tests results seemed to indicate. One test counsel recognized as the TOMM test and the other he did not recognize but it did not occur to him to inquire into the origins of that test. It is evident from Petitioner's brief as well as counsel's testimony at the evidentiary hearing that his decision not to pointedly question Dr. Call's administration of the test we now know as the "Blackwell Memory Test" was a matter of trial strategy. However, it was a strategy based upon counsel's admitted failure to recognize the significance of and determine the origins of Dr. Call's testing and raw data.

¶ 34 We must determine whether counsel's failure to discover and utilize this evidence rises to the level of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's errors, the results of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particu-

lar decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.,* 466 U.S. at 690–691, 104 S.Ct. at 2066.

¶ 35 We cannot fathom, in a case which boiled down to a battle of experts, why Petitioner's counsel failed to research the tests Dr. Call performed on Petitioner to confirm the origins of and the scientific validity of those tests before Petitioner's mental retardation hearing. The raw data was provided to counsel prior to the mental retardation jury trial. The evidence was discoverable with due diligence—that is clear from another attorney's discovery of the information in a separate and unrelated proceeding.

¶ 36 Although the trial court concluded in its last finding that the evidence in question would not have impacted the verdict rendered, we do not share that same confidence. Petitioner presented evidence supporting his claim of mental retardation. Dr. Call's testimony and his testing was essential to refute Petitioner's claims and attack his experts' findings. Evidence Dr. Call had himself made up and administered a non-standardized test to support his conclusion Petitioner was malingering would have been valuable impeachment evidence. No reasonable trial strategy would have supported a decision not to utilize this important impeachment evidence. *See e.g. Glossip,* 2001 OK CR 21, ¶ 17, 29 P.3d at 601. Had it been discovered and utilized, there is a reasonable probability the outcome would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068.

¶ 37 Under the circumstances presented here, we do not have confidence in the jury's verdict that Petitioner is not mentally retarded. It is likely the outcome of the case, the jury's verdict, would have been different had counsel discovered and utilized the impeachment information relating to Dr. Call. Further, we are bothered that this State's witness seemingly, intentionally, misled the trial court and the parties about the reliability of his own tests to strengthen the State of Oklahoma's case against Mr. Salazar.

¶ 38 Accordingly, it is the decision of this Court that the jury's verdict is hereby reversed. We hereby vacate Petitioner's death sentence and modify his sentence to life imprisonment without the possibility of parole. 20 O.S.2001, § 3001.1. Because we grant relief on this issue, the remaining propositions of error need not be addressed.

### *DECISION*

¶ 39 The jury's verdict on mental retardation in Comanche County District Court, Case No. CRF 1987–460, is hereby **RE-VERSED.** Petitioner's death sentence is **VACATED** and **MODIFIED** to life imprisonment without the possibility of parole. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005), the **MANDATE is OR-DERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J. and A. JOHNSON, J: concur.

LEWIS, J.: concurs in part/dissents in part.

LUMPKIN, V.P.J., dissents.

LUMPKIN, Vice–Presiding Judge: dissent.

¶ 1 Upon a review of the record in this case, I find the trial judge has provided a more accurate analysis of the evidence in this case than related in this opinion and therefore, I must dissent.

¶ 2 Initially, I find the broad range of IQ test results spanning from 50 to 83 made a *ipso facto* showing Petitioner is not mentally retarded. Mental retardation is a cognitive defect that originates at birth and is not subject to change over time. *See Murphy v. State,* 2003 OK CR 6, ¶ 23, 66 P.3d 456, 460. A truly mentally retarded individual will not, can not, produce test results over such a broad spectrum as has Petitioner.

¶ 3 Further, I disagree with the majority's characterization of Dr. Call's testimony. Dr. Call, a board certified forensic psychologist, is well known to this Court for his testimony in several of the recent cases involving issues

relating to mental retardation. The majority indicates that in testifying to Dr. Price's findings and opinion, Dr. Call used improper testing procedures, tests not "normed" for a person like Petitioner, and did not properly report the results. This is an incorrect statement of the record. The record reflects Dr. Call fully explained and disclosed his testing procedures, the tests were "normed" or appropriate for Petitioner, and that he reported all results.

¶ 4 The opinion further confuses the use of an "administrative pseudonym" to disguise the nature of an otherwise scientifically recognized test with the failure to use a scientifically recognized test. The record reflects the witnesses agreed there was no such independently recognized test labeled the "Blackwell Memory Test". This was merely a label utilized to hide the purpose of the test from the test taker, the purpose being to identify malingerers. The actual test was the "Forced Choice Symptom Validity Test", as referred to by Dr. Call, or simply "Symptom Validity Testing" as recognized by Richard Rogers, Editor, not the author, of the book, *Clinical Assessment of Malingering and Deception, Second Edition* (1997).[1] Therefore, the testing procedure was recognized as a valid, scientific testing method, only the method of giving the test was in question. That issue had nothing to do with how Dr. Call might have labeled the test to deceive Petitioner as to the true meaning of the test, i.e. determine whether Petitioner was faking his level of mental capacity at the time.

¶ 5 I view the allegation of error due to the use of the pseudonym on the heading of the test a "red herring" in determining the real issues presented in this case. The evidence reveals Dr. Call did not administer a test he just dreamed up or created on his own. He administered a Forced Choice Symptom Validity Test which utilized accepted principles supported by scientific literature in the field. It appears this test was consistent with the accepted TOMM test for which Petitioner's trial counsel did prepare. Was the use of the term "Blackwell Memory Test" somewhat

deceptive to counsel in the discovery process, as well as Petitioner in the testing process? Yes, but all counsel had to do was ask for a clarification as to the nature of the test and counsel would have been informed the test was simply a recognized application of the Forced Choice Symptom Validity Test that had been disguised to get Petitioner's actual responses rather than a possible contrived response. Counsel did not do that. So, the only question this Court should ask is: "was the failure to ask that one question sufficient to declare trial counsel ineffective?" I don't think so.

¶ 6 The record reveals the State provided open discovery and Petitioner's counsel readily admitted they had all the testing information from the State and Dr. Call in sufficient time prior to trial to have researched and discovered this issue. They chose instead to focus on other areas and did not research the specific makeup of this particular testing mechanism. As counsel stated, a strategic choice was made not to give Dr. Call more opportunity to validate his opinions due to the strength of his testimony, albeit potential impeachment may have been available regarding the failure to place the target words in random selection throughout the test. How important the random selection placement is versus the placement made by Dr. Call in the test results we do not know. However, we do know other valid test results confirmed the opinion of malingering and even without the Forced Choice Symptom Validity Test, in this case labeled "Blackwell Memory Test", Dr. Call's opinion would have been admissible.

¶ 7 In this case, I trust the findings of a respected, seasoned trial judge, District Judge Allen McCall, over a cold paper record to determine the impact on the jury. This is not a case where the defense was deprived of any evidence or discovery that was needed in the preparation for this trial. Based on my reading of the record presented, I believe this Court is reaching conclusions not supported by the record regarding the tests administered by Dr. Call and his testimony

---

1. Rogers' disagreement with the test, as reflected in Petitioner's supplemental authority was the manner in which it was administered, i.e. failure to present the target word randomly rather than present the correct choice first as was done by Dr. Call.

in relation to that of other experts. Therefore, I must dissent to the Court's decision to reverse the jury's verdict on mental retardation. We should follow the method of analysis set out in our recent case of *Myers v. State,* 2005 OK CR 22, 130 P.3d 262, 2005 WL 3334712 and not just suppose there is error that does not exist in this record. As Judge McCall stated in his findings, "this was an outstanding jury, very attentive, and fair minded to all witnesses and counsel". The evidence supports the verdict of the jury and this Court, pursuant to *Myers,* should affirm that verdict, rather than looking for an excuse to reverse or modify a valid sentence.

LEWIS, Judge, concurs in part/dissents in part:

¶1 I concur in reversing the verdict in this case. However, I dissent to modifying the sentence. I would reverse and remand for a new trial on the issue of mental retardation.