2006 OK CR 6

**Richard Lloyd ANDERSON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2004–882.

Court of Criminal Appeals of Oklahoma.

Feb. 22, 2006.

Richard Couch, Travis Grafe, Assistant Public Defenders, Tulsa, OK, attorneys for defendant at trial.

Todd Chesbro, Tara Perkinson, Assistant District Attorneys, Tulsa, OK, attorneys for State at trial.

Paula J. Alfred, Assistant Public Defenders, Tulsa, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Donald D. Self, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Presiding Judge.

¶ 1 Richard Lloyd Anderson was tried by jury and convicted of Murder in the First Degree, in violation of 21 O.S.2001, § 701.7(A), in the District Court of Tulsa County, Case No. CF–2003–3372. In accordance with the jury's recommendation the Honorable Rebecca Brett Nightingale sentenced Anderson to life imprisonment without the possibility of parole. Anderson appeals from this judgment and sentence, raising five propositions of error.

¶ 2 Forty-one year-old Mark Wilkins lived with his parents, Reuben and Patricia, in their Tulsa home. Wilkins was a methamphetamine user and dealer. He also repaired pool tables and did other odd jobs. He did not drive. Wilkins called Melissa Travis on Sunday, February 23, 2003, asking for a ride so he could repair a pool table. Travis, Wilkins's friend and fellow drug dealer, lived with Anderson at Tammy Rhodes's apartment along with Ralph Colson, Rhodes's boyfriend. Travis agreed to give Wilkins a ride after Wilkins promised to give her some methamphetamine. She arrived at the house that afternoon, accompanied by the defendant, Anderson, her six-year-old daughter, and Tammy Rhodes's 11–year–old stepsister, Nancy Duff. Before Travis got there, Wilkins called his parents at the lake at approximately 11:00 a.m. and 2:30 p.m. He warned them that because it was snowing hard, the roads were bad and they should come home, and said he was waiting on a friend to give him a ride.

¶ 3 Shortly before 5:00 p.m. Reuben and Patricia returned to Tulsa. The snow at the house was several inches deep, and they could see a car had been parked in their driveway. As Reuben approached the house he saw bloody footprints on the walkway from the door to the car tracks in the driveway. Reuben unlocked the door and entered, walking through the kitchen to the den. A drawer was open in the kitchen, and a recliner was overturned in the den. Beyond the recliner Reuben could see Wilkins's feet. Wilkins was lying facedown in a pool of blood. He wore only a bloody shirt, which was open in the front. Most of the shirt buttons were torn off and scattered on the floor. There was a great deal of blood on and around Wilkins's head, face, chest and forearms, but very little blood on his legs and none on the soles of his feet. Wilkins's blood-soaked hands were bound behind him with an electrical cord. Another electrical cord was wrapped tightly around his neck. That cord was connected to the electrical cord from a battery charger lying near Wilkins's left hip. The charger electrical cord was pulled taut down Wilkins's back, between his buttocks, and the cables from the battery charger were wrapped around his right thigh. The clamps lay near Wilkins's testicles. A large commemorative glass beer bottle rested on Wilkins's back, underneath the charger electrical. cord. Smears and pools of blood were in front of the fireplace in the center of the room. Large blood pools, clots, smears, and spatter were near the French doors and on the carpet and objects not far from the body. Wilkins's cell phone, wallet and dark-colored duster coat were missing, along with a trash can liner and a heavy glass paperweight. In addition to sustaining severe head wounds, Wilkins's neck had abrasions, lacerations and bruising unconnected with the ligature, and his hyoid bone was fractured. The medical examiner concluded Wilkins died from blunt force trauma and strangulation.

¶ 4 Melissa Travis testified that, when they reached the house, she left Rick and the girls

in the car and went to get Wilkins. Travis expected Wilkins to be ready to leave, but he was unsuccessfully trying to shoot up a dose of methamphetamine. After several minutes, he told her to bring the girls in. Wilkins was unhappy that Travis had brought Anderson, but invited him in as well. Eventually Wilkins finished injecting the drug and joined the adults in the living room. They began to argue. Suddenly, Travis testified, Anderson picked up a glass paperweight, rushed over to the recliner, and hit Wilkins in the head. Travis said she tried to separate the two, then took the girls out to the car. Travis returned to the house and began carrying her personal belongings from the front room to her car. She eventually looked in the den. Wilkins, prone and fully clothed, lay near the French doors while Anderson sat on him, repeatedly hitting his head with the paperweight. Anderson told Travis he would kill Wilkins. Travis testified she joined the girls in the car and waited until Anderson left the house, wearing a dark-colored duster coat and carrying a trash bag with a heavy object inside. Travis took Anderson to his sister's apartment, dropped off the girls, then picked Anderson up and brought him to their apartment, where he showered and changed clothes. Travis was initially questioned by police several weeks after the murder, and suggested that Rhodes was involved in it. She later told officers that Anderson had killed Wilkins.

¶ 5 Several aspects of Travis's testimony were corroborated by other evidence. Tammy Rhodes saw Travis and Anderson leave with the girls on Sunday morning. Wilkins left phone messages for Rhodes twice that afternoon, and Travis's voice was in the background. Rhodes's mother, Robbin Duff, talked to Travis that afternoon on the telephone, and heard the girls and Anderson in the background. Robbin Duff also saw Anderson return to the apartment to take a shower. Nancy Duff testified that she, Anderson, and Travis's daughter went with Travis to see "that guy", briefly went in the house, then had to sit in the car. A teenager shoveling snow across the street saw a skin-

ny blond woman, two children and a man at the Wilkins's house; the woman was carrying things from the house to a car resembling Travis's car. Reuben Wilkins testified that a trash can liner, glass paperweight, and dark-colored duster coat were missing from the house. Physical evidence at the scene and the autopsy results confirm Travis's description of the blows she saw and Wilkins's probable locations at some time during the assault. When police tested the electrical cord around Wilkins's wrists, they found a mixture of Wilkins's DNA and some other person's. Travis and several other suspects were excluded, but Anderson could not be excluded as a source of the DNA mixture.

¶ 6 Anderson claims in Proposition I that the State's DNA expert, Dr. Fuller, overstated her scientific findings with inaccurate and misleading testimony. Dr. Fuller analyzed the DNA mixture found on the electrical wire binding Wilkins's wrists.[1] She first attributed all the DNA mixture she could to a known subject by subtracting from the mixture all the DNA components belonging to the victim. Several DNA components remained. She tested that DNA against four suspects, including Travis, Rhodes and Anderson. Only Anderson could not be excluded as a contributor to the remaining DNA. Dr. Fuller testified that, statistically, the odds of getting a match between Anderson and the remaining DNA in the mixture were one in 4,200 United States Caucasians, one in 17,000 African Americans, and one in 18,000 Hispanics.

¶ 7 Anderson does not complain about this basic scientific evidence. He claims that Dr. Fuller's attempts to explain her methodology and findings were inaccurate, misleading, unscientific, and prejudicial. The record does not support this claim. Dr. Fuller clearly testified regarding the DNA test procedures she used. She repeatedly stated that testing was a process of exclusion—that is, she could only exclude persons as DNA contributors, then calculate the probability that the DNA belonged to a person not ex-

1. Dr. Fuller used the STR, or short-term repeat, method of DNA analysis, which employs a polymerase chain reaction. Anderson does not question or contest the scientific validity or admissibility of this testing procedure.

cluded. Dr. Fuller characterized as "conservative" the procedure in which she subtracted the victim's known DNA from the mixture to be tested, since that subtraction necessarily restricted the remaining DNA available for comparison to suspects. Dr. Fuller described this as erring on behalf of the defense, since DNA likely to be shared by a suspect and victim was not included in the comparison test using only a suspect's DNA. This, in turn, led to a much larger statistical pool of persons whose DNA would be compatible with the remaining DNA in the mixture. For example, Wilkins's DNA could not be excluded from DNA on a piece of chewed gum at the scene, and statistically, there was a one in 7.4 million chance that any other person's DNA would match. In other words, one could double Oklahoma's population before finding another person likely to have deposited that DNA on that piece of gum. By contrast, 4200 people other than Anderson could, statistically, have matched the DNA mixture found on the wire—or about ten percent of the Tulsa population.[2]

■ ¶ 8 Anderson claims that Dr. Fuller's testimony assumed his guilt, and implicitly told the jury he committed the crime. He argues that Dr. Fuller's methodology could not have erred "on behalf of the defense" unless you assume that the defendant was the person depositing the DNA. Thus, he claims, Dr. Fuller told jurors that her methodology favored Anderson because he was guilty. On the contrary, Dr. Fuller never implied that Anderson committed the crime or was guilty. In fact, on cross-examination she readily admitted that many other people in the Tulsa area could have deposited that DNA in the mixture found on the electrical cord. In her testimony, Dr. Fuller used an unfortunate but common verbal shortcut. She testified that she compared the DNA mixture to four *suspects*, and that Anderson was the only *suspect* who could not be excluded in that test. As the jury was extensively instructed, being a suspect—or even being charged with a crime—does not mean a person is guilty. Dr. Fuller's characterization that her conservative methodology favored the defense acknowledged the reality that, in this particular case, the suspect she could not exclude was also the defendant.

■ ¶ 9 Dr. Fuller's testimony neither went beyond the bounds of scientific testimony, presumed that Anderson was guilty, nor proved that Anderson committed the crime.[3] Any conclusion jurors may have made that Anderson was at the crime scene did not, as he suggests, arise from Dr. Fuller's claim that her methodology favored the defense. It arose from the fact that his DNA could not be excluded from a DNA mixture found on a cord binding Wilkins's wrists. The prosecutor did not use this information improperly in arguing that the DNA evidence connected Anderson to the crime, and corroborated Travis's testimony; nor was it error to remind jurors that Dr. Fuller's methodology was conservative and erred on the side of the defense.[4] This proposition is denied.

¶ 10 In Proposition II Anderson claims the trial court erred in denying his request to instruct the jury that, under Oklahoma law, he would be required to serve 85% of any sentence imposed for murder before being eligible for parole (85% Rule). Anderson initially requested this instruction be included in the closing instructions to the jury. That request was denied. During deliberations, the jury sent out a note asking how

2. Anderson also suggests that Dr. Fuller's testimony suggested to the jury that other evidence proved Anderson's guilt, since it left to the imagination the extent to which the defense was favored and the State penalized. Dr. Fuller testified that the defense was favored to the extent that the statistical probability of others matching the suspect's DNA were proportionately greater. We fail to see any way in which this suggested that the jury should go outside the record or assume other evidence existed which would warrant a finding of guilt.

3. This case simply does not compare with the egregiously improper testimony given in *McCarty v. State*, 1988 OK CR 271, 765 P.2d 1215, 1218–19. There, the witness testified that her analysis of the scientific evidence showed that the defendant was present during the crime. This not only invaded the province of the jury but exceeded the capabilities of the scientific testing methods used in the case.

4. Parties may argue reasonable inferences from the evidence. *Banks v. State*, 2002 OK CR 9, 43 P.3d 390, 401, *cert. denied*, 537 U.S. 1126, 123 S.Ct. 898, 154 L.Ed.2d 811 (2003).

many years had to be served before a person was eligible for parole. Apparently without consulting counsel, the trial court responded that the jury had all the law and evidence necessary to render its decision. After this answer was given and a verdict reached, the trial court asked whether counsel objected to that answer. Anderson objected to the trial court's response and noted he had requested an instruction on the 85% Rule.

¶ 11 This Court has traditionally rejected all suggestions that, in non-capital cases, jurors receive any instruction regarding parole eligibility. However, it is time for this Court to revisit this issue in light of the enactment and effect of Oklahoma's "truth in sentencing" legislation. On March 1, 2000, legislation enacting Oklahoma's 85% Rule went into effect. This legislation was part of a "truth in sentencing" movement nationwide. One important goal of the "truth in sentencing" laws is to give jurors, and the general public, accurate information about sentencing. Armed with this information, jurors in jury-sentencing states like Oklahoma can confidently impose a sentence with some idea of the length of time a defendant will actually serve, as opposed to the uncertainty evident during Anderson's deliberations.

¶ 12 Unfortunately, Oklahoma jurors are not currently instructed on the 85% Rule, or its consequences. This Court has not reconsidered this issue in light of the 85% Rule in any published opinion.[5] Our handful of unpublished opinions denying a request for an instruction on the 85% Rule contain no substantive analysis of the Rule or its effect, and rely on cases published before the Rule was enacted. In *Sanders v. State*,[6] we refused to address the issue where Sanders "failed to offer any authority requiring such an instruction." It is unfortunate that the Legislature

enacted a truth-in-sentencing law designed to give the public reliable sentencing information, while neglecting to include a specific clause requiring judges to instruct jurors on the law and its effects. However, common sense and elementary principles of statutory interpretation should compel this Court to take that omitted step, in order to give effect to the will of the Legislature.

■ ¶ 13 Our own case law supports the common-sense notion that jurors should be instructed on a statutory limit on parole eligibility. In *Mayes v. State*,[7] we held that the Legislature's addition of life without parole to the sentencing options in capital cases necessarily modified our prior holdings that parole should never be mentioned at trial:

> The legislature's actions in making life without parole a viable sentencing option in first degree murder cases has obviously modified this Court's previous rulings insofar as they mandate a blanket prohibition against the jury's considering parole in deciding which sentence is appropriate. By its actions, the Legislature has created a specialized area of the law which mandates the jury must consider the possibility of parole in determining whether a defendant convicted of first degree murder must live or die. Therefore, we must modify our previous rulings.... [8]

The legislature has acted again, creating a specialized area of law regarding parole eligibility for specific serious felonies. Therefore, this Court should modify our previous rulings and recognize that for cases covered by this new sentencing reality—as in cases where life without parole is a sentencing option—the legislature's specific action compels a specific limitation on our traditional prohibition of mentioning parole at trial.[9]

---

5. The State suggests this Court has considered and rejected this argument in *Scott v. State*, 2005 OK CR 3, 107 P.3d 605, 606–07. *Scott* neither refers to the 85% Rule nor implies that it forms the basis for its holding, that the trial court did not err in failing to give the defendant's requested instruction on "matters of parole ineligibility". The phrase "parole ineligibility", in the context of an original prosecution for murder, suggests questions about the meaning of life without parole rather than the 85% Rule.

6. 2002 OK CR 42, 60 P.3d 1048, 1051.

7. 1994 OK CR 44, 887 P.2d 1288, *cert. denied*, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).

8. *Id.* at 1316.

9. *Mayes* emphasized that, under the law at that time, the possibility of parole after a conviction of murder varied from inmate to inmate. However, the 85% Rule is a specific, delineated parole provision that does apply to life sentences for murder (as well as numerous other crimes),

¶ 14 *Mayes* contains an extremely thorough analysis of the traditional rationale for prohibiting jurors from hearing about parole options. This analysis offers a cogent example of why changed circumstances require a change in the law. As *Mayes* explained, as traditionally understood parole is "a discretionary procedure exercised by the executive branch which provides for a condition subsequent to the conviction and sentence after the party has been incarcerated in the state penitentiary." [10] Any attempt a trial judge might make to explain the onset of parole eligibility in any specific case, before truth-in-sentencing, was thus inappropriate speculation.

¶ 15 The State claims that the trial court correctly responded to the jury's question about parole eligibility because this Court held in *Littlejohn v. State* that a trial court may refer jurors to the basic instructions when asked about the meaning of life without parole.[11] This reflects a basic misunderstanding of Anderson's claim. Anderson's jury did not ask about the meaning of the sentencing option, "life imprisonment without the possibility of parole." While confirming that trial courts may refer jurors to the instructions, *Littlejohn* encourages trial courts to honestly answer this question by confirming that a defendant sentenced to life without parole will not be eligible for parole. By contrast, Anderson's jurors specifically asked how long a person would remain in prison on a life sentence before becoming eligible for parole. That is, they wanted to know when Anderson would be eligible for parole on a sentence other than life without parole. This inquiry cannot be answered by the current standard jury instructions. However, it could be answered by an instruction based on the legislation mandating the 85% Rule.

¶ 16 The State suggests that trial courts may not instruct on the 85% Rule because such instruction would amount to speculation. With enactment of the 85% Rule, the legislature completely changed this traditional understanding of parole. Far from a discretionary procedure exercised by the executive branch, the 85% Rule is a legislatively-imposed restriction upon executive branch discretionary authority. Traditional parole decisions, such as those discussed in *Mayes,* are made after a defendant is convicted, sentenced, and has served a portion of his sentence. By contrast, application of the 85% Rule is determined by statute, before a defendant is convicted, sentenced, or imprisoned. The issue here is not, as the State suggests, concern about when a defendant *will be* paroled; that would truly be speculation. The issue is when, under Oklahoma law, a defendant is eligible to be considered for parole on a particular sentence. Unlike traditional parole questions, instruction on the 85% Rule does not require trial courts to speculate about possible future actions of the executive branch.

¶ 17 Other jury-sentencing states considering this issue have concluded that jurors should be instructed on specific, statutory limitations on a defendant's eligibility for parole. Anderson relies on *Fishback v. Commonwealth,*[12] in which the Supreme Court of Virginia reached this same conclusion, when faced with an almost exactly parallel situation. At the time of the *Fishback* decision, long-standing precedent in Virginia held that it was error to instruct a jury regarding a defendant's parole eligibility.[13] This prece-

---

which does not vary from one inmate to another, which can be readily defined and explained by a judge, and which is relevant and helpful information for the jury to consider. The legislature's adoption of 21 O.S.2001, §§ 12.1 and 13.1 removes the obstacle of uncertainty which posed such a barrier in the *Mayes* opinion, in regard to crimes covered by these provisions

**10.** 887 P.2d at 1317.

**11.** *Littlejohn v. State,* 2004 OK CR 6, 85 P.3d 287, 293–94, *cert. denied,* 543 U.S. 947, 125 S.Ct. 358, 160 L.Ed.2d 261.

**12.** 260 Va. 104, 532 S.E.2d 629 (2000).

**13.** *See, e.g., Coward v. Commonwealth,* 164 Va. 639, 178 S.E. 797, 797–99 (1935) (holding it was error for trial court to respond to jury question about when defendant might get out of jail by instructing jury regarding state system for calculating good behavior credits toward early release). The *Coward* court wrote: "It is error for the court, by its instructions, or for counsel in argument, to tell the jury that its sentence imposed and confirmed may be set aside or cut down by some other arm of the State." *Id.* at 799.

dent was based upon some of the same separation of powers concerns recited by our court in *Mayes* and other decisions.[14] Nevertheless, the *Fishback* court held that the passage of Va.Code § 53.1–165.1 by the Virginia legislature, which eliminated parole in non-capital felony cases, necessitated reversing the court's former approach for cases affected by the new statute.[15]

¶ 18 The court found that this statute simply eliminated the foundation of its traditional approach:

Code § 53.1–165.1 is clear and, as to those offenses to which it applies, it leaves no room for speculation by a jury as to what might occur thereafter during the executive department's administration of the sentence imposed. Moreover, as a result of the enactment of this statute the policy underlying the *Coward* rule is eroded. The executive branch no longer has the discretion to grant or deny parole because this statute abolishes parole. Thus, in the context of achieving the goal of "truth in sentencing," it simply defies reason that this information ought not to be provided to the jury by an instruction of the trial court.[16]

Hence the court overruled its past decisions for cases covered by the new rule. The State suggests that Virginia's statutory elimination of the possibility of parole renders *Fishback* useless for comparison or analogy with Oklahoma's 85% Rule, which leaves open the possibility of early release. On the contrary, the *Fishback* reasoning applies precisely to Oklahoma's situation. Each legislature chose to limit executive branch discretion regarding when (in Oklahoma) or if (in Virginia) a defendant is eligible for parole. This Court, like the Virginia Supreme Court, has been asked to apply this statutory limitation of discretion by instructing jurors regarding the legislative action and its consequences.

¶ 19 The *Fishback* court understood the delicacy of the task before it, i.e., the need to respect the separation of the judicial function from the executive function, while also recognizing that jurors have some awareness of the parole system, and attempting to ensure that they do not make sentencing determinations based upon inaccurate perceptions or misleading instructions.[17] The court wrote, "The question then becomes how a jury is to be instructed so that it is properly informed and can render a fair trial to both parties while preserving, as effectively as possible, the separation of the functions of assessing punishment and administering it."[18] The *Fishback* court determined that the best way to balance these goals was to require that Virginia juries be instructed upon the elimination of parole, as well as the possibility of

**14.** The *Coward* court emphasized that it was the jury's function (through the judicial branch of government) to determine the defendant's sentence, but that the actual enforcement of that sentence (through the executive branch) was none of the jury's business: "These jurors should have been told that it was their duty, if they found the accused guilty, to impose such sentence as seemed to them to be just. What might afterwards happen was no concern of theirs." *Id.* at 800.

**15.** Va.Code § 53.1–165.1 (effective Oct. 13, 1994). The Virginia Supreme Court had previously held that due to this same provision (along with a separate geriatric release provision, discussed further *infra* ), a defendant convicted of capital murder was entitled to an instruction informing his sentencing jury that he would be "parole-ineligible" if sentenced to life imprisonment. *See Yarbrough v. Commonwealth*, 258 Va. 347, 519 S.E.2d 602, 616 (1999). This decision, however, relied upon the "unique situation" faced by a jury that must decide whether or not to sentence a defendant to death. *Id.*

**16.** *Fishback*, 532 S.E.2d at 633.

**17.** The court wrote:

[W]e have noted that "[u]nder our system, the assessment of punishment is a function of the judicial branch of government, while the administration of such punishment is a responsibility of the executive department. The aim of the rule followed in Virginia is to preserve, as effectively as possible, the separation of those functions during the process when the jury is fixing the penalty, in full recognition of the fact that the average juror is aware that some type of further consideration will usually be given to the sentence imposed."
*Id.* at 632 (citation omitted). The court recognized that "juries frequently have no comprehension of the current state of parole eligibility in this Commonwealth, but remain concerned that their sentencing decision will be subjected to extensive reductions by executive action." *Id.*

**18.** *Id.* at 633.

geriatric release, for convictions affected by these statutory provisions.[19]

¶ 20 The court recognized that a "conundrum" had been created by the interaction of these and other statutory provisions, namely, "that, depending on the length of the sentences imposed and the age of the defendants, some persons convicted of non-capital felonies will not be eligible for any form of early release, while others may be able to benefit from geriatric release, good behavior credits, or both."[20] The court reasoned that in addition to being informed about the elimination of parole, a sentencing jury should be informed about the possibility of geriatric release, in cases where the defendant's conviction and age made such release a possibility.[21] On the other hand, the court upheld its traditional prohibition upon argument and instruction regarding "good behavior credits."[22]

¶ 21 The court made this distinction by noting that "[t]he determination of a prisoner's eligibility for geriatric release is essentially a mathematical calculation," which is "readily determinable" and "not subject to speculation."[23] Yet a defendant's future eligibility for good behavior credit "necessarily involves the unpredictable conduct of a prisoner, and to a significant degree the subjective assessment of that conduct by employees of the Department of Corrections."[24] Hence the *Fishback* court devised an approach that accommodated both the traditional value of avoiding juror speculation, as well as the goal of providing information to assist the jury in the performance of its sentencing task:

> A jury should not be required to perform [its] critical and difficult responsibility without the benefit of all significant and appropriate information that would avoid the necessity that it speculate or act upon misconceptions concerning the effect of its decisions. Surely a properly informed jury ensures a fair trial both to the defendant and the Commonwealth.[25]

¶ 22 The issue before us today only arises in the tiny minority of states that even have jury sentencing and, in particular, within those jury-sentencing states whose legislatures have acted to prospectively limit the executive branch's parole-granting authority. In addition to Virginia, the States of Kentucky,[26] Arkansas,[27] and Texas[28] have all

---

19. Virginia's statute for the conditional release of geriatric prisoners, Va.Code § 53.1–40.01, took effect on October 13, 1994 (the same day that § 53.1–165.1 took effect). The provision states:

   Any person serving a sentenced imposed upon conviction for a felony offense, other than a Class 1 felony, (i) who has reached the age of sixty-five or older and who has served at least five years of the sentence imposed or (ii) who has reached the age of sixty or older and who has served at least ten years of the sentence imposed may petition the Parole Board for conditional release.

   Va.Code § 53.1–40.01. Oklahoma provides that the Pardon and Parole Board may consider for early release inmates who have reached at least sixty years of age and have served at least fifty percent of the sentence which would have been imposed for the offense provided in the Truth in Sentencing matrix enacted in 1997 (and subsequently substantially repealed), excepting certain offenses. 57 O.S.Supp.2004, § 332.7(A)(2).

20. *Id.* at 632.

21. *Id.* at 634.

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.* at 633.

26. In *Boone v. Commonwealth,* 780 S.W.2d 615 (Ky.1989), the Kentucky Supreme Court evaluated the constitutionality of Ky.Rev.Stat. Ann. § 532.055(2)(a)(1), which provided that the Commonwealth could introduce evidence to a sentencing jury regarding a defendant's minimum parole eligibility, but did not grant this same right to defendants. The *Boone* court held that it violated due process to grant this right to the Commonwealth, without giving it likewise to the defendant, and held that henceforth, "the privilege of introducing said evidence shall be extended to the defendant and the Commonwealth." *Id.* at 617.

27. In *Teague v. State,* 328 Ark. 724, 946 S.W.2d 670 (1997), the Arkansas Supreme Court addressed the constitutionality of Ark.Code Ann. § 16–97–103(1) (adopted in 1993), which provides that sentencing juries may be instructed upon the law governing a defendant's eligibility for parole, meritorious good time, and transfer. The *Teague* court rejected the defendant's challenge to the statute, finding that even though it had previously held that the possibility of parole was "too speculative a proposition for the jury to properly consider," the legislature's adoption of the new statute reflected a change in public

recognized that it is appropriate to provide sentencing juries with information about the impact of statutes that determine a defendant's future eligibility for parole. With our decision today, Oklahoma joins these states. In particular, we follow the thoughtful and balanced approach exemplified by the Supreme Court of Virginia's decision in *Fishback v. Commonwealth.*[29]

¶ 23 This approach allows Oklahoma's sentencing juries to more accurately gauge their intended sentences, according to an informed perspective on parole eligibility. Since jurors are likely to assume that defendants would become parole eligible at a much earlier point in time, explaining the 85% Rule will avoid unnecessary and unfair prejudice to the defendant—due to juries "rounding up" their sentences, in an attempt to account for their uninformed guesses about the impact of parole. Thus instructing upon the 85% Rule will actually discourage jury speculation, while still respecting the separation between the judicial and executive branches. Although 85% of a given sentence may not be as readily calculable as perhaps 50% or 75%, the concept is clear, and there is no good reason not to provide Oklahoma's sentencing juries with this critical information about how the sentences they give are required to be served.

¶ 24 We recognize that the sentencing options in Anderson's case, life and life without parole, are not limited on their face to a term of years. The Oklahoma Pardon and Parole Board currently, and for the past several years, has provided that parole for any sentence over 45 years, including a life sentence, is calculated based upon a sentence of 45 years.[30] In keeping with our stated policy of instructing the jury fully on the law, using clear and plain language,[31] we hold that a jury instruction on the 85% Rule in cases such as Anderson's should include some reference to this policy (or any successor policy).[32] In summary, we conclude that, if a defendant is sentenced to a term of imprisonment, he will be required to serve at least eighty-five percent (85%) of this sentence within the Department of Corrections. The defendant will not be eligible to be considered for parole until he has actually served at least eighty-five percent (85%) of the sentence imposed. In determining the application of the 85% Rule to a life sentence, we take into account the Oklahoma Pardon and Parole Board provision that parole for any sentence over 45 years, including a life sen-

policy that the court was bound to acknowledge and accept. *Id.* at 672–73. The court likewise rejected the defendant's claim that the challenged provision violated the separation of powers: "The fact that the jury may take into consideration when a person convicted of a certain class of felony is *eligible* for parole or transfer is in no way a usurpation of the executive department's power and authority to decide when an individual defendant should be released." *Id.* at 730, 946 S.W.2d 670 (emphasis in original).

28. Texas has adopted a statute requiring that for covered offenses, sentencing juries must be given specific, enumerated instructions on how a defendant's eligibility for parole will be calculated, as well as the potential for "good conduct time" to potentially decrease the period of incarceration. *See* Tex.Code Crim. P. Ann., Art. 37.07, § 4. In addition to good conduct and parole procedures, Texas jurors are specifically instructed: "It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities. You may consider the existence of the parole law and good conduct

time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant."

29. The situation facing the Virginia Supreme Court in *Fishback* was actually much more complex than the one facing this Court, due to the interplay of Virginia's no-parole statute with its laws regarding geriatric release and good behavior credit. Oklahoma's 85% Rule is a much simpler standard to put before the jury, and our statute explicitly provides that the 85% threshold for parole consideration cannot be reduced by any type of earned credits. *See* 21 O.S.2001, § 12.1.

30. Oklahoma Pardon and Parole Board Policy 004 I.A.3.a.

31. *Cohee v. State,* 1997 OK CR 30, 942 P.2d 211, 215.

32. In conjunction with this Opinion, the Court will refer the issue to the Oklahoma Uniform

tence, is calculated based upon a sentence of 45 years.

¶ 25 As in the life without parole context, this further exception to the traditional rule does not "open a floodgate of parole information."[33] In *Mayes*, this Court concluded that "the concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further."[34] We likewise conclude that the 85% Rule is a specific and readily understood concept of which the jury should be informed, and which will not necessitate further explanation or justify further discussion of general parole issues and procedures. While this decision gives effect to the legislative intent to provide juries with pertinent information about sentencing options, it does not amount to a substantive change in the law. A trial court's failure to instruct on the 85% Rule in cases before this decision will not be grounds for reversal.

■ ¶ 26 In Proposition III Anderson correctly claims that the prosecution violated the federal and state duties to disclose exculpatory evidence. Essentially, the common thread in this case was methamphetamine. The discovery provided to Anderson showed that Rhodes, Colson, Wilkins, Travis, and Anderson all used or dealt in methamphetamine. Anderson's defense was that Wilkins was murdered as the result of a falling-out among drug dealers, and he was not involved. Although she was not an ideal witness,[35] Travis was the State's star witness. Before trial, Anderson knew that Travis was a methamphetamine user who got drugs from Wilkins. He did not know, although the State did, that Travis was herself involved in dealing drugs with Wilkins and Ralph Colson. Travis told prosecutors this a week before trial, but prosecutors did not inform defense counsel.

¶ 27 The information that Travis, Wilkins and Colson dealt drugs together was first presented during the State's redirect examination of Travis. The State did not bring this out in its original direct examination. On cross-examination Travis testified that Wilkins told her he was waiting for "big guy", his dealer, to come by the house the Sunday he was killed. She also said Wilkins was rumored to be in danger because he had paid for drugs with counterfeit money. On redirect the prosecution referred to this testimony and asked whether Travis was involved in the drug dealing. She replied that Colson and Wilkins trusted her to hold the money and go with Wilkins to pick up drugs from "big guy". Defense counsel objected, claimed a discovery violation, and asked for a mistrial. The trial court found that the prosecution's failure to disclose this evidence violated discovery. The court took the motion for mistrial under advisement and granted a half-day continuance to allow defense counsel to interview witnesses and investigate. The court noted that defense counsel would have the coming weekend to prepare should they wish to refine their strategy in light of any information obtained through those interviews and Travis's testimony. The trial court eventually denied the motion for mistrial.

■ ¶ 28 The prosecution is required to turn over to defense counsel any evidence favorable to an accused which is material to guilt or punishment.[36] Evidence is material where there is a reasonable probability—sufficient to undermine confidence in the outcome—that the result of the proceedings would have been different had the evidence been disclosed.[37] This does not mean that disclosure of the evidence must have resulted in acquittal, or that with disclosure evidence would have been insufficient to convict, but that disclosure of the evidence would have

Jury Instruction Commission for promulgation of a jury instruction on the 85% Rule.

33. *Mayes*, 887 P.2d at 1318.

34. *Id.*

35. Travis admitted on the stand that she was mentally ill and on medication, a drug user, a liar, a thief, and kidnapped her children.

36. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). This requirement extends to both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 677, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985).

37. *State v. Munson*, 1994 OK CR 77, 886 P.2d 999, 1002; *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

put the case in a different light.[38]  We agree with the trial court's determination that failure to disclose this evidence was a violation of the continuing discovery order in the case. We further find that the evidence here was material, and the failure to disclose it violated both state and federal law.  Anderson claimed Wilkins was killed as a result of a disagreement among unknown drug dealers. The State withheld information that Travis and Colson, both involved in various aspects of this case, were dealing drugs with Wilkins.[39]  This information put the case in a new and different light.

▮ ¶ 29 This error does not require relief.  Mindful of the United States Supreme Court's determination that this type of error cannot be treated as harmless, we do not apply harmless error analysis.[40]  However, we find that the trial court's actions in granting a continuance and making witnesses available for interviews cured this violation. Defense counsel interviewed Colson and Rhodes regarding the drug-dealing operations, as well as reviewing other discovery previously provided.  After these interviews, counsel stated that Anderson was prejudiced by the violation because it affected their theory of the case.  However, counsel never pointed to other specific action he would have taken, or any change in defense strategy, had

he received this information in a timely manner.  Counsel did not state any specific way in which he would conduct the case differently, or describe any particular damage to his theory of the case, other than to claim he was generally prejudiced.  Counsel used the information to argue in closing that Travis was a lying, drug-dealing criminal with a motive to murder Wilkins, and suggest that in fact she did murder him.  The trial court did not err in refusing to grant a mistrial.[41]  This proposition is denied.

▮ ¶ 30 Anderson claims in Proposition IV that he was denied effective assistance of counsel.  Anderson must show counsel's performance was so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and that the deficient performance created errors so serious as to deprive him of a fair trial with reliable results.[42]  We measure counsel's performance against an objective standard of reasonableness under prevailing professional norms.[43]  We give great deference to trial counsel's strategic decisions, considering his choices from counsel's perspective at the time.[44]  We presume counsel's conduct was professional and could be considered sound strategy.[45]  We will not find counsel ineffective where we determine that the defendant was not prejudiced by counsel's actions or omissions.[46]  Anderson

38.  *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

39.  This is not comparable to a failure to provide a detailed description of a witness's projected testimony in discovery, and the State's reliance on *Stemple v. State,* 2000 OK CR 4, 994 P.2d 61, *cert. denied,* 531 U.S. 905, 121 S.Ct. 247, 148 L.Ed.2d 178, is misplaced.

40.  *Kyles v. Whitley,* 514 U.S. at 435, 115 S.Ct. at 1566.

41.  *Knighton v. State,* 1996 OK CR 2, 912 P.2d 878, 894, *cert. denied,* 519 U.S. 841, 117 S.Ct. 120, 136 L.Ed.2d 71 (trial court action in granting sufficient continuance to explore undisclosed material and prepare cured error).

42.  *Hooks v. State,* 2001 OK CR 1, 19 P.3d 294, 317, *cert. denied,* 534 U.S. 963, 122 S.Ct. 371, 151 L.Ed.2d 282; *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington,* 466 U.S. 668,

687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984).

43.  *Rompilla v. Beard,* —— U.S. ——, 125 S.Ct. 2456, 2462, 162 L.Ed.2d 360 (2005); *Wiggins,* 539 U.S. at 521, 123 S.Ct. at 2535.

44.  *Rompilla,* 125 S.Ct. at 2462; *Wiggins,* 539 U.S. at 523, 123 S.Ct. at 2536; *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2066; *Hooks,* 19 P.3d at 317.

45.  *Ryder v. State,* 2004 OK CR 2, 83 P.3d 856, 875–76, *cert. denied,* 543 U.S. 886, 125 S.Ct. 215, 160 L.Ed.2d 146; *Patterson v. State,* 2002 OK CR 18, 45 P.3d 925, 929; *Banks,* 43 P.3d at 402; *Hooks,* 19 P.3d at 317.

46.  *Williams v. Taylor,* 529 U.S. 362, 393, 120 S.Ct. 1495, 1513, 146 L.Ed.2d 389 (2000) (defendant prejudiced where counsel's actions deny him a substantive or procedural right to which he is entitled by law); *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Hooks,* 19 P.3d at 317; *Alverson v. State,* 1999 OK CR 21, 983 P.2d 498,

does not meet this test, and this proposition is denied.

■ ¶ 31 Anderson first argues that counsel was ineffective for failing to object to Dr. Fuller's testimony that her methodology was conservative and erred on behalf of the defense. We found in Proposition I that this testimony was not error. As the testimony was proper, counsel cannot be faulted for failing to object to it. Anderson has not shown he was prejudiced by counsel's failure to object.

■ ¶ 32 Anderson also claims counsel failed to use available evidence from the preliminary hearing to impeach Travis. At preliminary hearing Travis testified that she had no deal with the State but hoped for some benefit regarding punishment in return for giving evidence. Travis testified at trial that she had not made a deal with the State and neither hoped for nor expected any benefit from the State for her testimony.[47] Anderson claims counsel was ineffective for failing to impeach Travis's trial testimony, that she did not hope for a benefit, with her preliminary hearing testimony that she did hope for some effect on her punishment. Counsel conducted a thorough and far-ranging cross-examination, getting Travis to admit she was a drug user, liar and thief who kidnapped her children and was familiar with Wilkins's drug business. He forcefully argued in closing that Travis had a motive to commit the murder and a motive to escape punishment by accusing Anderson. Travis consistently (and, apparently, accurately) testified that she had no deal with the State. Her claim that she did not hope for any benefit from testifying was, in context of her entire testimony, unlikely. Anderson fails to show any prejudice from counsel's failure to bring out this slight inconsistency between Travis's preliminary hearing and trial evidence.

510, *cert. denied,* 528 U.S. 1089, 120 S.Ct. 820, 145 L.Ed.2d 690 (2000).

47. After Anderson's trial ended, Travis pled to a charge of accessory after the fact and received five years imprisonment and five years probation. The State dropped the murder charge.

1. 21 O.S.2001, § 12.1, the so-called 85% rule, mandates that a defendant who is convicted of certain crimes must serve "not less than eighty-

¶ 33 Anderson claims in Proposition V that the accumulation of error in his case requires relief. Our resolution of Proposition II, requiring instruction on the 85% Rule, renders this proposition moot.

## Decision

¶ 34 The Judgment and Sentence of the District Court is **REVERSED** and **REMANDED** for resentencing. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, V.P.J.: concurs in part/dissents in part.

C. JOHNSON and A. JOHNSON, JJ.: concur.

LEWIS, J.: specially concurs.

LUMPKIN, V.P.J.: Concurs in Part/Dissents in Part.

¶ 1 I agree some action needs to be taken with respect to the jury instructions applicable to the "85% rule,"[1] as set forth further below. However, that action would have no bearing on this particular case because the jury sentenced Appellant to life imprisonment *without* the possibility of parole. Obviously, then, jurors decided that whatever parole policies might apply to a regular life sentence, Appellant should be ineligible.[2]

¶ 2 Be that as it may, I agree that the Oklahoma Legislature's enactment of the 85% rule has "changed the rules," relating to sentences imposed for a certain term of years. But the same cannot be said for life sentences, for the reasons set forth below.

five percent (85%) of the sentence of imprisonment imposed" before becoming eligible for parole consideration.

2. *Fishback v. Commonwealth,* 260 Va. 104, 532 S.E.2d 629 (2000), the case that supposedly presents an "almost exactly parallel situation" to the one faced here, is in actuality completely distinguishable, presenting an altogether different issue than determining what 85% of life means in Oklahoma.

¶ 3 This Court has previously addressed the application of the percentage of a sentence to be served in relation to a life sentence, when we interpreted 57 O.S.1987, § 353 (now 57 O.S.2001 353.1) in *Underwood v. State,* 1990 OK CR 1, ¶ 3, 786 P.2d 707, 708 and in *White v. State,* 1989 OK CR 20, ¶ 4, 774 P.2d 1072. There, we held that statute was inapplicable to a life sentence, because the term of a life sentence could not be determined in finite terms. *Id.*

¶ 4 It seems to me that the administrative policies of an executive branch panel, the Oklahoma's Pardon and Parole Board, should not be used to dilute a life sentence imposed by an Oklahoma jury. Life, in Oklahoma, means life, and therefore 85% of a life sentence is not discernable with any mathematical certainty. It is a dangerous practice (and possible violation of the separation of powers doctrine) for the judicial branch to simply defer to the Pardon and Parole Board's administrative and somewhat arbitrary decision to treat life sentences as a set number of years for all defendants, no matter their age or health of life expectancy. In effect, what the Court has done is take the Pardon and Parole Board administrative edict regarding when they will first "consider" an inmate for parole and modified a valid life sentence to that term. That is an arbitrary use of power. It would be more accurate on an individual basis to use the actuarial mortality tables used by insurance companies to say when an inmate can be considered for parole rather than the one size fits all approach here, and even that would tend to change over time.

¶ 5 I believe the legislative intent should be applied and would agree it is appropriate for a judge to advise a jury a defendant must serve 85% of any term of years imposed, regardless of the number of years. However, what constitutes service of 85% of a life sentence is anybody's guess. We should not play games with the sentence given here, for to do so would disregard legislative intent. Indeed, the language the Court uses today, if it had been given as a jury instruction, would have informed jurors that a person sentenced to life imprisonment without the possibility of parole is eligible for parole after 85% of 45 years is served. For these reasons, I dissent

to the methodology adopted to apply the provisions of 21 O.S.2001, § 12.1, to life sentences.

¶ 6 Due to the complexity of this issue, the best process for this Court to follow is to follow precedent in this case and affirm the judgment and sentence, while at the same time referring the issue to the OUJI–CR Committee to review and submit a recommendation to the Court regarding the form and scope of an appropriate instruction, giving full force and effect to legislative intent.

LEWIS, Judge, Specially Concurring.

¶ 1 I concur with the Court's opinion that the Legislature's enactment of 21 O.S.2001 § 12.1, the 85% Rule, changed the traditional understanding of parole. The Court is unanimous in the opinion that in all cases that carry a determinate number of years, jurors should be instructed about a defendant's parole ineligibility when the 85% Rule applies. I also concur in the holding that in cases involving a possible life sentence, the jury will be instructed that a defendant sentenced to life imprisonment must serve at least 85% of 45 years before he is eligible for parole. This case squarely presents the question of what a sentence of life imprisonment means when the 85% rule applies, and the Court discharges its duty to interpret the nature of that sentence drawing on the longstanding parole eligibility policy of the Pardon and Parole Board.

¶ 2 I share the concern expressed by Judge Lumpkin about the appropriateness of this Court accepting the administrative decision of the Pardon and Parole Board governing parole eligibility for a life sentence. Because I do not conclude that the Court's requirement of an instruction informing the jury of the current 45–year policy (and any successor policy, as the majority points out), read in conjunction with the statutory requirement that a defendant serve at least 85% of that 45 years, frustrates the sentencing authority of the Legislature as conferred on judges and juries or impairs any prerogative of the executive branch to alter its current policy, I join in the holding of the Court. Defendants sentenced to life imprisonment in this way remain under that sentence all of

their days, and obtain their liberty only after a recommendation from the Pardon and Parole Board, and then only conditionally, under terms dictated by the Governor, if ever. The instruction required by the Court's opinion only illuminates for a jury the actual execution of a life sentence, without altering the substantive nature of the sentence imposed.

¶ 3 I also distinguish the situation here from one where a jury, properly instructed on the application of the 85% requirement to the charged offense, is called upon to assess punishment for a term of years within the statutory range. I do not read the majority opinion to require the trial court to include language in its 85% instruction about the Pardon and Parole Board's 45-year policy when the sentencing range is any term of years and does not include the possibility of life imprisonment. Indeed, the trial court should not include such language. In such cases the jury, now fully informed of the sentencing consequences for the defendant, can assess punishment within the range authorized by the Oklahoma Statutes.

